MONROE, X
Plaintiff prosecutes this appeal from a judgment rejecting its demand for $2,745.44 claimed as damages alleged to have been sustained by reason of defendant’s failure to deliver to it certain lumber called for by a written contract, of date May 27, 1904, reading, in part, as follows:
“Said Slattery agrees to furnish * * * an average of 75,000 feet, per month of green cypress, * * * at the prices and of the dimensions given below; this lumber to be loaded in cars, each class and dimension to itself, delivered f. o. b. cars to the Northeastern road in this city. * * * This agreement to remain in force to the 31st day of December, 1904. * * * »
The petition alleges that deliveries were made between June 13, 1904, and June 8, 1905, amounting to 212,376 feet, and between June 8, 1905, and August 29, 1906, amounting to 64,749 feet, making a total of 277,125 feet as against 525,000 feet called for by the contract, thus leaving due 247,875 feet, with respect to which plaintiff is entitled to recover the amount stated by it as the difference between the contract price and “the present market price” (speaking as of date May 23, 1907). It further alleges that early in 1905 it agreed with defendant to increase the contract price of said lumber by $1 per 1,000 feet, and that said increased price was paid on shipments made during that year and up to August 29, 1906. Defendant filed certain exceptions, which, by consent, were referred to the merits, and answered, admitting the contract sued on, and alleging that, in order to fill the same, he made a contract with the Caillou Manufacturing Company, through J. W. Martin, its president (whose name we shall hereafter uso in that connection), whereby that company agreed to deliver the same lumber as that called for by said contract with plaintiff, and upon practically the same terms, save that defendant was to receive a commission of 5 per cent.; that said company became slow in its deliveries and new arrangements were made, to which plaintiff was a, party; and that plaintiff finally entered into' an agreement • with said company, to which defendant was not a party, for the lumber still due, thereby placing it out of defendant’s power to compel shipments by said company, as per its contract with him, and. releasing defendant from all liability in the premises.
The facts, as we find them, are as follows: Plaintiff is a manufacturer engaged in converting lumber into sashes, doors, etc., and defendant buys and sells lumber, both for his own account and on commission. Operating for his own account, he made the contract sued on; and for his own account, he on the following day made the contract with Martin whereby he was to get the lumber at a slightly lower price than that at which he had agreed to deliver it to plaintiff, and was to receive a commission of 5 per cent, on the price to be obtained by him. If, before making the contract with plaintiff, he had any understanding with Martin, the record fails to show it; and the record also fails to show definitely that plaintiff knew, in making its contract, where defendant expected to get the lumber with which to fill it, though from the provision in said contract reading, “In addition to the above, all 3” clear stock cut by the mill is to be delivered under the same terms as above at $32 per 1,000 feet,” it might perhaps be inferred that defendant was contracting with reference to the output of a mill of his own. However that may be, he undertook to execute his contract with plaintiff by means of his contract with the Oaillou Manufacturing Company, and during the year 1904 delivered to plaintiff, through that company, 174,437 feet of lumber. It appears, however, that Martin, who represented the company, and the men who worked for him were interested in sugar, and, when the grinding season opened, *922 he (Martin) “shut down” the sawmill and turned his attention to the sugar crop, and kept it turned in that direction until the season closed, or, say, February 1, 1905, at which time he appeared disposed to drop the lumber contract altogether. Thus on February 13, 1905, defendant wrote to plaintiff that he had just seen Martin, who had not then started his mill; that Martin had announced that he considered his contract at an end and did not intend to deliver any more lumber under it.
“Your contract [the letter continues] ■ is, of •course, with me, and my contract, of the same kind, is with him. If you hold me legally, I will, of course, hold him, as I was simply working on commission.”
Martin finally agreed that he would continue to make deliveries, provided he was paid 500 per 1,000 additional, and provided that the lumber should be inspected at the mill and the salary of the inspector paid by plaintiff, and those concessions were agreed to by the three parties concerned. About that time (April, 1905) defendant himself delivered to plaintiff 17,088 feet of lumber, which he obtained “outside, and on May 17th Martin delivered 62,112 feet, under the new •agreement”; but it appears that he understood that it was part of the new agreement that defendant was to waive his commission of 5 per cent., whilst defendant un■derstood that his proposition so to do had been declined. In the settlement for the shipment last above mentioned, the commission was therefore deducted from the price, and Martin became dissatisfied and ■again refused to go on (though defendant then renewed the proposition to waive his ■commission on future shipments); and no more lumber was delivered under either of the contracts during, the year 1905. Plaintiff seems, then, to have placed the matter in the hands of an attorney, and defendant •and Martin also employed attorneys, and on February 9, 1906, defendant wrote to plaintiff’s attorney that he and his attorney were doing everything possible to have Martin live up to his contract; that Martin would call on plaintiff in a few days, and attempt to settle matters.
“But, if he does not [the letter continues], I will call to see you, along with Mr. Zuntz [defendant’s attorney], and we will take such action as will force an issue with Mr. Martin. There is no desire on my part to escape liability, but, as Mr. Zuntz explained to you, Mr. Spearing- [Martin’s attorney] concedes the liability of his client, and if we could get your permission to sue in your client’s name, without any expense to your client, we could so much sooner bring- things to an end,” etc.
The consent thus asked for was not given, but a little later Martin appears to have called on plaintiff and to have made certain propositions, as a result of which it was agreed that he should make deliveries, amounting to, say, 25,000 feet of lumber per week on the river, instead of on cars (he having found that he could bring the lumber to New Orleans at a less cost by means of canals leading to the river); but, in view of the fact that such delivery involved an additional expense for drayage from the river to plaintiff’s factory, it was also agreed that such drayage, amounting to $1 per 1,000, should be charged to Martin. On May 3, 1906, defendant wrote to plaintiff, in part, as follows:
“Inasmuch as the Caillou * * * Company does not consider itself, under changed conditions, bound to me for the delivery of the cypress lumber originally contracted for, it some time ago * * * made an arrangement with you, as I understood from your Mr. Tiemann, to carry out its obligation, provided you would agree to- take the lumber by barge or boat from the Mississippi river in front of the city, in lots of two ear loads (or 20,000 to 25,000 feet) a week. * * * If you are willing to accept the responsibility of the * * * company and take the lumber in such quantities as it may care to ship in, it is satisfactory to me, provided you release me from any obligation I may have to your company. If, on the other hand, you insist on holding me, I must ask you to permit me to sue in your name so as to force compliance with the contract, because in this way only can I be protected. Tbe fact that the * * * company has ignored me in the arrangement it made with you to deliver direct *924 makes it evident that any suit that I might bring in my own name would be defended on the ground that the changed conditions under which shipments are being made shifted the company’s responsibility so that it is bound to deliver to yon and not to me. Of course, if you should see fit to permit me to sue in your name, I would expect to engage my own attorney and hold you harmless against any expense whatever.”
Another letter, to about the same effect, was written on Hay 28, 1906, but apparently without result. Martin appears to have gone on making deliveries under the new arrangement, the aggregate quantity of lumber so delivered between April 1 and August 31, 1906, being 99,850 feet, after which latter date no further deliveries or offers to deliver under either of the contracts were made. This suit was instituted in May, 1907, but defendant’s answer was not filed until February, 1908. On March 4, 1908, defendant wrote to plaintiff, disclaiming further liability in the matter, but making the following proposition by way of compromise, to wit:
“At the time your company contracted for the cypress lumber, it agreed to pay $7 less than the then prevailing dry list price, since it was purchasing green. If I can get you, for immediate delivery, say, 220,000 of dry cypress at $5 off tbe present list payments to' be net cash, as were those to the Caillou * * * Company, will you accept [naming grades and thickness preferred! and consider it a discharge of the obligation which you allege I owe you?”
On March 18, 1908, another offer of compromise was made in which defendant, after referring to certain alleged errors in plaintiff’s statement and to certain deliveries which should be deducted, says:
“It would leave the deficit 220,276, of which 108,989 were ‘2’ shops.”
In his testimony, however, defendant gives figures, which he says were furnished him by plaintiff, showing that the total deliveries amounted to 353,487 feet, and hence that the deficit is 171,573 feet. Tiemann, on" the other hand, gives figures purporting to show that the total deliveries amounted to 277,125 feet and the total deficit to 247, 875 feet. But he at one time testifies that he obtained his information from a “stock, book,” and at another time that there was. no such book; and, though plaintiff was called on to produce some book or record showing its receipts, it failed to do so. Moreover, we find the evidence conclusive to the effect that there were delivered 174,437 (and probably 175,434) feet in 1904, and (17, 088+62,112=) 79,200 feet in 1905, making a total of not less than 253,637 feet in those two years, whereas Tiemann accounts for but 212,376 feet; and we see no reason why he should not have been equally mistaken as to the deliveries in 1906, which he states amounted to 64,749 feet, as against 99,-850 feet claimed by defendant, upon the basis of statements furnished him by Tiemann, and admitted by Tiemann to be in his. handwriting. We conclude, therefore, notwithstanding the admissions contained in defendant’s letters, to accept the figures given by him in his testimony as to the deliveries and deficits, and we find them to have been as follows:
Called for by Contract. Delivered. Deficit. Over-plus.
Clear 49,000, 1" ........... 2,403 46,597
49.000, 1%" and V/a" 38,824 10,176
42.000, 2" .......... 12,123 29,877
Select 42,000, 1" .......... 35,569 6,431
42.000, 1%" ........ 17,467 24,533
56.000, 1%” ........118,173 62,173.
35.000, 2” .......... 28,024 6,976
Shops 84,000, 1", 114" &1 W 81,538 2,462
126,000, 2" .......... 19,366 106,634
525,000 353,487 233,686
Less overplus .......... 62,173
Total deficit ............ 171,513
[1-4] Plaintiff claims in its petition the difference between the contract price of green lumber and the market price of dry lumber in May, 1907 (when this suit was instituted), and offered some testimony to the effect that, under certain conditions, it. *926 would cost as much to get the one as the other. In the brief of its counsel, it claims the difference stated, as the first of two alternatives, and, as the second, asks that it be allowed the difference between the contract price of green lumber and the market price of the same at the date stated. Defendant made no contract to deliver dry lumber, and plaintiff had no immediate use for the green, its purpose in contracting for •it being to hold it until it became dry; and the evidence shows that the outlay, loss of interests, etc., involved in the drying amounts to from $5 to $8 per 1,000, and that, when dry, the lumber is worth just that much more. On the other hand, whilst plaintiff argues that the difference in price between the green and the dry should be taken as the measure of its damages, because there was no green lumber on the market, its secretary admitted that he made no effort to obtain green lumber to fill the contract sued on, and it called a lumber dealer and broker to the stand who gave the prices at which he made sales of green lumber during the years 1905, 1906, and 1907, from which it follows that green lumber was on the market and could have been bought, though probably not as readily as the dry. We are of opinion that, in view of the manner in which the contract sued on was permitted to be partially executed, defendant should not be held (for the purposes of this suit) to have been in default until after the final cessation of deliveries in 1906, but that there is no reason for fixing the date of such default as that upon which the suit was instituted in 1907. On the other hand, we find no merit in defendant’s contention that plaintiff is estopped to assert its present claim by reason of its dealings with Martin, since the sole purpose of those dealings was to facilitate the execution of the contract and obtain the lumber called for by it, and defendant was in no manner prejudiced by what was done; his insistence upon using the name of plaintiff for the purposes of a suit against Martin having nothing whatever, in the way of contract right or common reason, to rest on. We find the difference between the prices of the different classes and dimensions of green lumber, as specified in the contract, and the prices at which such lumber was sold in this market in 1906 to be as follows:
Contract Selling Prices. Price in 1906. Difference.
Clear stock 1" ............ . $26 00 $26 00
1 %" and 1%" . 27 00 2S 00 $1 00
2" ........... . 28 00 30 00 2 00
Selects 1" ................ . 19 25 20 00 76
1%'' .............. . 20 25 21 00 75
1W .............. . 20 25 21 00 3 75
2" ................ . 22 00 25 00 3 00
Shops 1" to 1%" ......... . 16 00 18 00 2 00
2" ................. . 17 00 20 00 3 00
There were, as we have shown, 62,173 feet of 1%" selects delivered in excess of the quantity called for by the contract; but, as the lumber was accepted on the whole contract and in reduction of the total deficit, it follows that defendant is to account, not for the actual deficits in the other classes and dimensions, but for the pro rata of each. Thus the aggregate of the deficits is 233,686 feet, and the overplus in “1 %" selects” is 62,173 feet; deducting the one from the other and we have 171,513 as the total deficit to be dealt with and to be attributed to the different classes, other than the 1%" selects, in proportion to the actual deficits in each as follows:
Actual Pro Con- Price DifUer-Deñcits. Rata, tract in'06. ence. Price.
Clear 1" .......... 46,597 34,155 $26 $26 00
1%" and 1%" 10,176 7,459 27 28 7 45
2" .......... 29,877 21,899 28 30 42 89
Selects 1" ......... 6,431 4,713 19 20 4 71
1 %" ........ 24,533 17,982 20 21 17 98
2" ......... 6,976 5,113 22 25 15 33
Shops 1" to 1W .. 2,462 1,804 16 18 3 60
2" .......... 106,634 78,162 17 20 234 48
Total $326 48
*928 It is therefore ordered that the judgment appealed from be set aside and that there now be judgment in favor of plaintiff and against the defendant, Edward L. Slattery, in the sum of $326.44, with legal interest thergon from judicial demand until paid, and all costs.