WILSON & COMPANY, INC., A CORPORATION, APPELLEE, V. FREMONT CAKE & MEAL COMPANY, A CORPORATION, APPELLANT.

43 N. W. 2d 657

Filed July 24, 1950. No. 32745.

*Beghtol & Rankin, Sidner, Lee & Gunderson, Kenneth E. Anderson, Nate C. Holman, George E. Svoboda,* and *John C. Mason,* for appellant.

*Kennedy, Holland, DeLacy & Svoboda, Louis R. Simpson,* and *Spear, Lamme & Flory,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought by the plaintiff, Wilson & Company, a corporation, against the Fremont Cake

& Meal Company, a corporation, to recover damages for the alleged breach of contract for the sale and delivery of soybean oil to the plaintiff. At the close of all the evidence the plaintiff moved for a directed verdict. This motion was sustained. From the overruling of defendant's motion for a new trial and entry of judgment on the verdict in the amount of $41,175 and costs, the defendant perfected appeal to this court.

For convenience we will refer to the appellant, Fremont Cake & Meal Company, a corporation, as the Fremont company, and to the appellee, Wilson & Company, corporation, as Wilson & Company. The Commodity Credit Corporation, Washington, D. C., a corporate agency of the United States government, will be referred to as the CCC, and the Office of Price Administration, an agency of the United States government, as the OPA.

We review the record with the following rule in mind: "In determining whether or not a verdict should have been directed by the trial court, the evidence must be considered in the light most favorable to the party against whom the motion was made; that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom." Thoren v. Myers, 151 Neb. 453, 37 N. W. 2d 725.

The following facts are not in substantial dispute: On August 10, 1945, Wilson & Company entered into a contract identified as No. 3447-W, negotiated by B. E. Forssell, the manager of the refinery department of Wilson & Company, through the Marwood Company, Incorporated, a brokerage concern. The contract was confirmed by B. E. Forssell, and is as follows:

"August 10, 1945   No. 3447-W

Seller        MARR SOYBEAN PROCESSING COMPANY, 130 North Broad Street, Fremont, Nebraska.

| | |
|---|---|
| Buyer | WILSON AND COMPANY, Refinery Department, 4100 South Ashland Avenue, Chicago 9, Illinois. |

Gentlemen: We confirm transaction today for your account as follows:

| | |
|---|---|
| Commodity | SOYBEAN OIL. |
| Quality | Crude. |
| Quantity | Thirty six (36) Buyer furnishing tankcars of approximately. 61,000 pounds capacity each. |
| Weight | Certified. |
| Price | Eleven and three-quarters cents (11-¾¢) per pound (or O.P.A. ceiling price in effect at time of shipment) f.o.b. Fremont, Nebraska. |
| Terms | Sight Draft/Bill of Lading attached for amount of invoice, free of exchange to buyer. Weights & quality guaranteed at destination. |
| Ship-ment ⎱ Time | Three (3) tankcars each month October, 1945, through September, 1946. |
| ⎰ From | Fremont, Nebraska. |
| Other Conditions | Seller warrants that crude soybean oil covered by this contract will be produced from beans acquired in accordance with his processor contract with the CCC, or any other government agency controlling the marketing and crushing of oilseeds during season 1945-46. This contract is subject to any government regulation controlling the movement and allocation of crude soybean oil. Subject to tankcar regulations by ODT. |
| Rules | National Soybean Processors Association. |
| Brokerage | |

This confirmation is made in triplicate, one copy being sent to the buyer, one to the seller, and one retained on file in this office.

MARWOOD COMPANY, INC.
As Brokers Only
By Marvin Wood

Buyer to have privilege of unloading shipments immediately on receipt, seller to be notified by mail of details as to quality and weight adjustment."

On or about September 1, 1945, the Fremont company succeeded to the business of the Marr Soybean Processing Company. The Fremont company, with the consent of Wilson & Company and the Marr Soybean Processing Company, adopted and agreed to carry out the terms of the contract set out, and which will hereinafter be referred to as the contract. The Fremont company, under the terms of the contract, delivered to Wilson & Company 30 tank cars of soybean oil at the price provided for in the contract. When the Fremont company assumed the contract it was obligated to take over contracts to furnish Armour & Company 36 cars of oil, the Interstate Cottonseed Oil Refining Company a minimum of 33 cars, in addition to the 36 cars for Wilson & Company, making the total commitment of 105 cars of oil.

On September 10, 1945, Harry E. Wiysel, manager of the Fremont company, signed for the company the CCC contract. The CCC contract provided: "1. Purchase of Soybeans. The processor shall purchase for his own account, upon the terms and conditions hereinafter specified, soybeans of the 1945 crop, either directly from producers or from others who have paid producers not less than the support prices specified * * * in a total quantity not in excess of the quantity he can process on or before October 10, 1946 (to be

determined by multiplying the total daily capacity of the Plant * * *)."

The last delivery was made by the Fremont company on September 24, 1946, leaving six tank cars of soybean oil to be delivered to Wilson & Company, which were never delivered and which constitute the subject matter of the instant case.

The plaintiff's petition alleged that six tank cars of soybean oil remained undelivered under the contract; that by mutual consent the time for delivery of the same was extended so that there could be delivered during the latter part of October 1946, three of the tank cars of soybean oil, and the last three during the latter part of November 1946. Due to the failure of delivery as pleaded, the plaintiff prayed damages in the amount of $43,005, based upon the failure of the Fremont company to perform the contract.

The defendant's answer, insofar as the same need be considered, alleged in substance that delivery under the contract was to be made from October 1945, through September 1946; the soybean oil to be furnished under the contract was required to be produced according to the Fremont company's contract with the CCC or any other government agency controlling the marketing and crushing of soybeans into oil during the 1946 season which ran from September 10, 1945, to October 10, 1946; that the defendant used all soybeans allowed it under the CCC contract and allocated the oil processed therefrom between the three contracts to which it was committed when it assumed the contract from the Marr company; and that defendant notified plaintiff it would be required under a prior contract, before proceeding with new contracts, to furnish two tank cars of soybean oil. Defendant also alleged that Wilson & Company was advised early in October 1946, that the contract could not be fulfilled because of government regulations controlling the movement and allocation of soybean oil, and its processor's contract; that any default that occurred

was on or before October 1, 1946; and further, that Wilson & Company gave no notice of default as required by rule 116 of the Soybean Processors Trading Rules. Defendant also alleged that the terms "Eleven and three-quarters cents (11-¾¢) per pound (or O.P.A. ceiling in effect at time of shipment) f.o.b. Fremont, Nebraska," were intended and understood by the parties and the industry and interpreted in practice to mean ceiling price now in effect, or ceiling price in effect at the time of delivery, or if no ceiling price, then market price at the time of delivery; and that the Fremont company never at any time after October 1, 1946, offered to ship any soybean oil to Wilson & Company except at the market price at time of delivery.

Wilson & Company is engaged in the packing business, and also refines crude soybean oil into margarine or cooking oil.

We make reference to the documentary evidence only insofar as the same relates to the six tank cars of soybean oil not delivered.

B. E. Forssell testified in behalf of Wilson & Company that on or about the 10th of September 1946, he was in Fremont and contacted Mr. Wiysel, manager of the Fremont company. His purpose was to endeavor to purchase soybean oil for his company. He talked to Wiysel about the scarcity of oil and this contract. Wiysel told him: " 'We owe you six tanks more than we are shipping this month, but I think by next month we will be Okeh and ship again.' " Forssell said that would be all right, "we have a contract on it and I suppose you will live up to your contract." There was nothing more said by Wiysel.

On October 11, 1946, Wilson & Company wired the Fremont company: "ACCORDING OUR RECORDS WE HAVE SIX TANKS SOYBEAN OIL STILL DUE US MARWOOD CONTRACT 3447-W STOP PLEASE WIRE WHEN YOU PLAN LOAD THESE REMAINING SIX TANKS DUE GIVE US LOADING DATES AS

YOU SEE THEM." On October 14, 1946, the Fremont company wired Wilson & Company: "EXPECT TO LOAD THREE TANKS LAST HALF OCTOBER THREE TANKS LAST HALF NOVEMBER WILL ADVISE LOADING DATES LATER."

This witness testified that he kept familiar with the OPA ceiling prices, and on October 1, 1946, the ceiling price was $11\frac{3}{4}$ cents per pound for soybean oil, the price when the contract was entered into. There was a very short period during the summer when the ceiling prices were off, but during the interim the price stayed at $11\frac{3}{4}$ cents per pound. The OPA was put back on with the same ceiling price. On October 1, 1946, an order of the OPA made the ceiling price $13\frac{1}{2}$ cents per pound for soybean oil. One delivery on this contract was made between October 1 and October 16, 1946. It was shipped in September. The ceiling price on the day of the last shipment was $11\frac{3}{4}$ cents per pound. The latter part of October and November 1946, when the Fremont company, by its telegram of October 14, 1946, stated it expected to load three tanks the last part of October and three tanks the last half of November, the ceiling price at that time was $13\frac{1}{2}$ cents per pound. On October 16, 1946, the ceiling price was withdrawn.

On November 1, 1946, Wilson & Company wired the Fremont company, "YOUR WIRE OCT. 14TH ADVISING EXPECT TO LOAD THREE TANKS SOYBEAN OIL LAST HALF OCTOBER THREE TANKS NOVEMBER WHEN WILL YOU WANT THESE EMPTY TANKS FOR LOADING WIRE REPLY." On November 2, 1946, the Fremont company wired Wilson & Company: "RETEL WILL NOT HAVE OIL TO SHIP UNTIL LATE NOVEMBER WILL CONTACT YOU WHEN CAN SHIP AND SET PRICE ON OIL." This last telegram received from the Fremont company by Wilson & Company was the first indication that there would be any other price than the contract price charged for the soybean oil.

On November 5, 1946, this witness received a long distance telephone call from Wiysel wherein Wiysel wanted to make an adjustment as to prices on the six cars that had not been delivered. He was informed that there was no adjustment, as the price was on the contract, 11¾ cents per pound.

On November 15, 1946, this witness wrote the Fremont company referring to the telephone conversation with Wiysel, and stated that this oil, on the basis of the contract, was due and coming to Wilson & Company at 11¾ cents per pound, f.o.b. Fremont, inasmuch as this was the last OPA ceiling price in effect.

On November 16, 1946, the Fremont company wired Forssell in Chicago: "OFFER TO SHIP SIX CARS SOYBEAN OIL DECEMBER JANUARY IF ACCEPTED IN FULL SATISFACTION OF HARWOOD CONTRACT NO. 3447W." On November 16, 1946, Forssell wired the Fremont company in reply to this offer to ship six cars of soybean oil December 1946, and January 1947, and that it was satisfactory to ship same on dates mentioned at 13½ cents per pound in full satisfaction of the contract.

On November 18, 1946, the Fremont company wired Forssell: "OUR WIRE 16TH OFFER TO SHIP SIX CARS PREDICATED ON AGREEMENT AT CURRENT OIL MARKET WHICH WE BELIEVE IS 23 CENTS." This marked the first time that the Fremont company set a definite figure for the price of the six cars in controversy, which was the current price on that date. There was a fluctuation of prices after the ceiling was removed, from 20 to 23 cents, and then from 24 to 25 cents the latter part of November 1946. The last day of October the market price was 22 cents.

On November 18, 1946, Forssell wrote the Fremont company making reference to its telegram of November 16th wherein it offered to ship six cars of soybean oil in December and January in full satisfaction of the contract, to which Wilson & Company replied that it

would accept the six tanks at 13½ cents per pound, and that they received a telegram from Fremont company offering the six cars at 23 cents per pound. Not to have any misunderstanding, Wilson & Company reiterated the position as outlined in its letter of November 15th, "that on the basis of our contract with you this oil is due and coming to us at 11-3/4¢ per lb., but without waiving any of our rights we would accept these six tanks you offer us for December-January shipment at 13-1/2¢ per lb. in full satisfaction of this contract." There was no reply received to this letter.

On December 2, 1946, Forssell wired the Fremont company: "NO REPLY OUR LETTER NOVEMBER 18TH WHAT CAN WE EXPECT SIX TANKS SOY-BEAN OIL DUE ON MARWOOD CONTRACT NO. 3447-W." December 3, 1946, the Fremont company wired Forssell: "RETEL OFFER SHIP CAR SOYBEAN OIL CURRENT MARKET 25 CENTS." On December 3, 1946, the market price of soybean oil was 25 cents per pound.

Harry E. Wiysel, manager for the Fremont company, testified that its factory was located at Fremont, Nebraska, and that it engaged in the processing of soybean oil; that he was familiar with the CCC contract with his company, and the same was referred to in the contract between the Fremont company and Wilson & Company under the language contained therein, "Other Conditions"; and that the CCC contract was the only contract under which the Fremont company operated in the processing of soybeans into crude oil during the season of 1945-1946. In accordance with the CCC contract, the Fremont company went into the market and purchased soybeans at $2.04 per bushel, paid to the grower. The Fremont company sold the soybeans to the CCC for $2.04 per bushel, and repurchased them from the CCC at 37 cents less a bushel, which constituted the margin of profit to the Fremont company.

The CCC contract provided that the Fremont company

(the processor) was privileged to purchase soybeans of the 1945 crop "in a total quantity not in excess of the quantity he (the processor) can process on or before October 10, 1946 (to be determined by multiplying the total daily capacity of the Plant * * *," which is in this instance 2,300 bushels daily, which would entitle the Fremont company to purchase 759,000 bushels. Wiysel further testified that a bushel of soybeans would produce 8½ pounds of oil, or, 6,451,500 pounds of soybeans would be equivalent to 105⅔ tank cars. At the time the CCC contract was entered into the Fremont company had commitments of 105 tank cars. The Fremont company purchased 691,338 bushels of soybeans under the CCC contract between October 1, 1945, and October 10, 1946, the production was based on 80 percent of the plant's capacity. Assuming that there were 8½ pounds of oil to the bushel, 96 tank cars of oil could be produced. Thirty cars were delivered to Armour & Company, 27 cars to the Interstate Cottonseed Oil Refining Company, and 30 cars to Wilson & Company, or a total of 87 cars. Wiysel further testified that the total production of soybean oil from the 1945 bean crop was 5,588,120 pounds. This would be equivalent to 91½ cars.

The Fremont company's plant was shut down in September, the greater part of October, and in November, 1945, due to inability to procure adequate machinery, steel, and other items necessary to keep the plant in full production.

Wiysel further testified that Wilson & Company never at any time informed the Fremont company it would waive the requirements that any soybean oil sold to it under this contract be produced from beans acquired in accordance with its contract with the CCC or any other government agency controlling the marketing or crushing of oilseeds during the season 1945-1946, and nothing was said to the Fremont company about waiving the defaults and the delivery of soybean oil in October 1945, and April and May 1946. He testified that he kept ad-

vised of the OPA ceiling prices in effect from time to time, and that after October 16, 1946, the ceiling was unlimited; it was the market price. He related his conversation with Forssell in September 1946, where matters were discussed about the contract, and wherein he related to Forssell the difficulties he had during the past year, previous to September 1946, to the effect that one large expeller was on order, that delivery was promised in time to commence operation on the 1945-1946 crop, that delivery was not made until October 1, and the plant was not in operation until the end of October. He also explained to Forssell the difficulties in obtaining repairs for the other expellers. One expeller was down for six weeks and another a like period of time in December and January, and they were unable to obtain repairs due to war conditions. He further explained to Forssell that the Fremont company had other contracts that were to be filled, and that the Fremont company carried the contracts making delivery on a pro rata basis, month by month. Forssell said nothing with reference to that matter, and indicated he would accept the oil at a later date. Wiysel testified that the Fremont company was agreeable to shipping the remaining six cars of oil at a later date at the maximum permitted under the OPA.

The Fremont company asserts the contract is subject to the rules of the National Soybean Processors Association which appear in the Year Book and Trading Rules of the National Soybean Processors Association. Rule 115 contained therein deals with arbitration. Rule 116 deals with contingencies, and specifically refers to war. We will discuss this rule later in the opinion. In addition, rules for arbitration of the American Arbitration Association are also pertinent to the contract, and the Fremont company asserts that the refusal of the trial court to admit into evidence all of such rules relating to arbitration constitutes prejudicial error. Further, the United States Arbitration Act, Title 9, U. S. C. A., sections 2, 3, and 4, are applicable and should be enforced

in the state courts, and the failure of the trial court to so do constitutes prejudicial error.

In this act it is provided that a written provision in any contract involving commerce to settle by arbitration an existing controversy arising out of such contract shall be valid and enforceable. By section 3 it is provided that if any suit or proceeeding be brought in any court of the United States upon any issue referable to arbitration, the court in which the suit is pending, shall, on application of one of the parties stay the trial until such arbitration has been had, provided the applicant for the stay is not in default in proceedings in such arbitration.

Section 4 provides in part as follows: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any court of the United States which, save for such agreement, would have jurisdiction under the judicial code at law, in equity, or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."

The proper legal steps were taken by the Fremont company to present to the district court for Dodge County the question as to whether or not arbitration should be invoked by the trial court in the instant case. The trial court ruled against the Fremont company on its contention in such respect.

A brief history of this litigation is appropriate to relate in connection with this assignment of error. On July 11, 1947, Wilson & Company filed suit in the United States District Court for the District of Nebraska, Omaha Division, to recover damages against the Fremont company for alleged breach of contract (the contract involved in the instant case). On August 2, 1947, the Fremont company filed a motion to stay proceedings until arbitration had been had in accordance with Title

9, U. S. C. A., section 3. This motion was sustained. Subsequent proceedings in the federal court hereinafter referred to disclose no order upon the ruling of the court was signed by the parties or presented to the court for approval. See Wilson & Co., Inc. v. Fremont Cake & Meal Co., 77 F. Supp. 364.

On July 19, 1948, Wilson & Company filed a motion to dismiss its action in the United States District Court. This was before the service or filing of an answer by the Fremont company. This motion was sustained. In sustaining the plaintiff's motion the court said the plaintiff had, perhaps still has, the absolute choice of forums for the recovery of the damages it claims, beyond the possible intervention of the defendant. By plaintiff is meant Wilson & Company, by defendant is meant the Fremont company. That reflection does not enter into the ruling upon the point; but it obviates the suggestion that the procedure that is made mandatory in the federal court is being imposed upon a litigant brought there against its will and thereby deprived of the supposed advantages to it of the state court's traditional usages unaffected by Title 9, U. S. C. A., section 3. See Wilson & Co., Inc. v. Fremont Cake & Meal Co., *supra*.

The instant case was filed by Wilson & Company in the district court for Dodge County on October 29, 1948. The case proceeded to trial in the latter part of September 1949, and judgment was entered on the verdict on September 24, 1949.

On April 8, 1949, the Fremont company filed an original action in the United States District Court for the District of Nebraska, Omaha Division, seeking an affirmative order to require Wilson & Company to submit this controversy to arbitration, as provided for in U. S. C. A., Title 9, section 4. This original action was filed while the instant action was pending and undetermined in the district court for Dodge County, Nebraska. The United States District Court dismissed the Fremont company's original action filed therein on October 8, 1949, holding

that the Fremont company not only had taken none of the explicitly defined steps to institute arbitration, but that its course in the entire controversy had been dilatory and obstructive only. Despite the early threats of Wilson & Company in two letters to invoke the arbitration clause of the contract, it remained silent on the question touching arbitration and did not itself initiate the process or even assent to Wilson & Company's suggestion of its liability. See Wilson & Co., Inc. v. Fremont Cake & Meal Co., 83 F. Supp. 900.

This case was appealed to the United States Court of Appeals, 8th Circuit, and on June 27, 1950, an opinion was rendered by that court wherein the United States District Court was affirmed. There is no occasion to quote from the opinion, except to say that the Circuit Court stated the state court obtained jurisdiction of the controversy between Wilson & Company and the Fremont company long prior to the commencement of the present proceeding. "A conflict of jurisdiction is always to be avoided if possible and it is a general rule that the right of a plaintiff to prosecute his suit in a court having once attached, will not be taken away by proceedings in another court. The decision in this case does not purport to interfere in any respect with the jurisdiction of the State Court but unless it could have such an effect it can not be said to determine any actual substantive controversy between the parties." Fremont Cake & Meal Co. v. Wilson & Co., Inc., 183 F. 2d 57.

In connection with this assignment of error the following authorities of this jurisdiction are applicable.

Whatever distinction may be made elsewhere between arbitration generally and arbitration as to damages only, it is well settled in this state that a provision in a contract requiring arbitration, whether of all disputes arising under contract, or only the amount of loss or damages sustained by the parties thereto, will not be enforced, and that refusal to arbitrate is not available to the parties in an action growing out of the contract. See,

Schrandt v. Young, 62 Neb. 254, 86 N. W. 1085; National Masonic Accident Assn. v. Burr, 44 Neb. 256, 62 N. W. 466; German-American Ins. Co. v. Etherton, 25 Neb. 505, 41 N. W. 406; Rentschler v. Missouri P. R. R. Co., 126 Neb. 493, 253 N. W. 694, 95 A. L. R. 1.

We conclude that the Fremont company's assignment of error here discussed cannot be sustained.

The Fremont company contends a question for the jury was presented by the conflict in the testimony of Forssell and Wiysel regarding the telegrams and correspondence between them as to whether or not a new contract was made between the parties requiring delivery at an agreed price after September 1946.

The evidence shows that on October 11, 1946, a telegram from Wilson & Company to the Fremont company stated: "ACCORDING OUR RECORDS WE HAVE SIX TANKS SOYBEAN OIL STILL DUE US MARWOOD CONTRACT 3447-W STOP PLEASE WIRE WHEN YOU PLAN LOAD THESE REMAINING SIX TANKS DUE GIVE US LOADING DATES AS YOU SEE THEM." The Fremont company's answer dated October 14, 1946, said: "EXPECT TO LOAD THREE TANKS LAST HALF OCTOBER THREE TANKS LAST HALF NOVEMBER WILL ADVISE LOADING DATES LATER." We believe this exchange of telegrams constituted the terms of an extension agreement. It may be noted also that on November 16, 1946, the Fremont company offered to ship six cars of soybean oil in December and January, if accepted in full satisfaction of the Marwood contract, which was accepted by Wilson & Company.

There is an exchange of telegrams between Wilson & Company and the Fremont company with reference to the acceptance of the six tank cars of oil in December 1946, and January 1947, at 13½ cents per pound, which occurred after the Fremont company refused to deliver at the contract price. These telegrams show that in order to get the oil, Wilson & Company not only agreed to a future delivery, but to an increase in price to meet

the OPA ceiling price in effect October 16, 1946.

Where a certain date is fixed as the time limit for delivery of merchandise by the seller to the purchaser, and by subsequent agreement between the parties in the form of correspondence the time limit date for delivery is postponed, such agreement does not discharge the original contract, but the same remains in full force, changed only to the extent that delivery is postponed. See Sussman, Wormser & Co. v. Sea Food Co., 127 Miss. 420, 90 So. 116. See, also, Gruner Lumber Co. v. Algonquin Lumber Co., 123 Miss. 157, 85 So. 191; Roberts v. Benjamin, 124 U. S. 64, 8 S. Ct. 393, 31 L. Ed. 334.

There was no new contract made between the parties; there was merely an extension of time for delivery of the soybean oil.

The Fremont company contends that the trial court erred in denying it a right at the close of the evidence to amend its answer to further develop the defense that it was precluded from performing the contract because of war and conditions resulting therefrom.

This assignment of error is based on the evidence adduced that the Fremont company was unable to procure, due to priorities, the necessary machinery, supplies, and repairs to carry on maximum production of its plant; that the plant was shut down at intervals during the period of the contract so that delivery was impossible to be made under the terms of the contract; and that this condition made so by war developed unforeseen difficulties, and in addition, by soybean shortages and the CCC contractual limitations in procurement of the same. The evidence does not show that the Fremont company was hindered, delayed, or prevented by any act of war from processing and delivering the six tanks of soybean oil in question. The evidence does show that Wilson & Company consented to and acquiesced in each delay of delivery without waiving any of its rights under the contract to delivery of the six tank cars of oil in question. No facts existed when the contract in the instant case was made

and assumed by the Fremont company, which made it impossible of performance.

"Inconvenience or the cost of compliance, though they might make compliance a hardship, cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful. Parties sui juris bind themselves by their lawful contracts, and courts cannot alter them because they work a hardship. The rights of the parties must be measured by the contract which they themselves made. A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect, because it turns out to be difficult or burdensome to perform. It has been said that difficulties, even if unforeseen and however great, are no excuse, and that the fact that a contract has become more burdensome in its operation than was anticipated is not ground for its rescission." 12 Am. Jur., Contracts, § 362, p. 928.

"Contract obligations are not generally within the rule that a person will be absolved from nonperformance of an obligation or a duty imposed on him by law if performance is rendered impossible without his fault by an act of God or an unavoidable accident. * * * A more general rule which is well settled, though subject to exceptions, is that supervening impossibility is not an excuse for nonperformance of an act promised. A contract which is possible of performance when made does not become invalid or unenforceable because conditions afterwards arise which render performance impossible. * * * If a party by his own contract creates a duty or imposes a charge on himself, he must under any and all conditions substantially comply with the undertaking." 12 Am. Jur., Contracts, § 363, p. 930. See, also, Columbus Ry. P. & L. Co. v. Columbus, 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 699, 6 A. L. R. 1648; Cameron-Hawn Realty Co. v. Albany, 207 N. Y. 377, 101 N. E. 162, 49 L. R. A. N. S. 922:

In the absence of a statute to the contrary, conditions

arising from a state of war in which this country is engaged will not ordinarily constitute an excuse for non-performance of contract. See 17 C. J. S., Contracts, § 463, p. 953. See, also, J. C. Lysle Milling Co. v. Sharp (Mo. App.), 207 S. W. 72; Ingram Day Lumber Co. v. Kola Lumber Co., 122 Miss. 632, 84 So. 693.

As stated in Porto Rico Sugar Co. v. Lorenzo, 222 U. S. 481, 32 S. Ct. 133, 56 L. Ed. 277: "A part of the delay seems to have been caused by the repeated breaking down of the machinery, but nothing appears to take the case out of the ordinary rule that performance of an absolute undertaking is not excused by facts of that sort." See, also, Sunseri v. Garcia & Maggini Co., 298 Pa. 249, 148 A. 81, 67 A. L. R. 1428.

Some contention is made by the Fremont company that rule 116 of the Trading Rules 1945-1946, National Soybean Processors Association, which constitutes a part of the contract, governs. This rule deals with contingencies and does mention: "If in consequence of any act of God, fire, flood, wind, explosion, war, * * * an act of government, * * * the Seller may be unable to ship or the Buyer unable to receive, * * *," then provides a course of procedure to invoke the rule. The contention is that Wilson & Company failed to abide by or avail itself of this rule. The rule was not admitted into evidence. The trial court rejected rule 116 on the ground that it was tied into the arbitration feature of the contract. The rule also provided that on failure of the parties to agree that the contingency "has or will delay the execution of the contract, then the matter shall be arbitrated in accordance with Rule 115 of these Trading Rules * * *."

We have heretofore expressed the inapplicability of the rules with reference to arbitration in the instant case.

We conclude that the trial court did not abuse its discretion in denying the Fremont company the right to amend its answer, as contended for by it.

The Fremont company further contends that the trial

court erred in not admitting all of the correspondence between the parties, citing section 25-1215, R. R. S. 1943, as follows: "When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. When a letter is read, all other letters on the same subject between the same parties may be given. When a detached act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence." It cites also, Jensen v. Romigh, 133 Neb. 71, 274 N. W. 199; Culver v. Union P. R. R. Co., 112 Neb. 441, 199 N. W. 794; Roeder v. State, 119 Neb. 116, 227 N. W. 446.

This assignment of error involves certain correspond-. ence between Wilson & Company and one Mr. Eighmy, connected with a firm processing soybean oil which had no connection with the Fremont company. This correspondence was to the effect that Wilson & Company desired Eighmy to use his best offices to persuade the Fremont company to abide by the terms of its contract with Wilson & Company. Eighmy's reply was to the effect that Wilson & Company should not be favored in such respect, and should pay the market price for soybean oil. We are unable to discern in what manner this correspondence could affect any issue in this case. No prejudicial error resulted to the Fremont company by the rejection of this evidence.

The balance of the evidence upon which the Fremont company predicates error by the trial court not admitting the same, relates to correspondence by Wilson & Company through its counsel and representatives, relating to invoking arbitration against the Fremont company, also the refusal of the trial court in not admitting in evidence the entire complaint filed by the Fremont company in the federal court, after Wilson & Company introduced a part thereof as admissions against interest. The part of the complaint the Fremont company desired in evi-

dence dealt with arbitration. Suffice it is to say, the arbitration feature of the contract is not here involved. The trial court did not commit prejudicial error in rejecting this evidence.

The Fremont company contends the jury should have been permitted to decide whether or not, under the peculiar conditions existing at the time the contract was made, the parties intended the price to be 11¾ cents in any event unless the OPA fixed a different price, or whether it was the intention to recite the OPA price then in effect and prescribe a third person, to wit the OPA, to fix the price. If the latter was the case, then the failure of the OPA to fix any price after October 16, 1946, would discharge both parties from any liability under the contract. The Fremont company cites section 69-410, R. S. 1943. The contract is plain. It provided for 11¾ cents per pound unless the OPA raised the ceiling above that figure, and then it would be the ceiling price fixed by the OPA. In the absence of a ceiling price fixed by the OPA, the contract price is just what the contract provided, 11¾ cents per pound.

Forssell testified that the OPA ceiling was removed October 16, 1946. The evidence is that the OPA eliminated all control of soybeans. There was no ceiling price thereafter. The seller could sell at the market price, above the market price, or below the market price. There were no restrictions, and no reason why a jury should pass upon the question as contended for by the Fremont company. The Fremont company was obligated and required to fulfill its contractual obligation to Wilson & Company separate and apart from any contract with the CCC which it voluntarily entered into. In this connection there is no doubt that the Wilson & Company contract could have been fulfilled by the Fremont company. They were permitted to purchase enough soybeans under the CCC contract to fulfill this contract. There was no reason for Wilson & Company to be required to prorate with any other commitments held by

the Fremont company when they took over the Marr company obligations.

The measure of damages, where the delivery date within which delivery must be made has been postponed by the parties, is the difference between the contract price of the goods and their market value at such postponed date of delivery. See Sussman, Wormser & Co. v. Sea Food Co., *supra.*

The measure of damages in this case is the difference in the contract price of the six tank cars of soybean oil in question and the market value of the same at the time to which delivery is postponed. If delivery is postponed by agreement of the parties, the market value at the time to which delivery is postponed is taken as the criterion. See, Summers v. Hibbard, 153 Ill. 102, 38 N. E. 899, 46 Am. S. R. 872; Crescent City Mfg. Co. v. Slattery, 132 La. 917, 61 So. 870; Covington Mfg. Co. v. Ferguson, 204 Ala. 192, 85 So. 726; Loy v. Storz Electric Refrigeration Co., 122 Neb. 357, 240 N. W. 423.

An abnormal rise in the price of goods due to unusual trade conditions, such that a producer cannot perform his contract to fill his order without greater expense than anticipated, is not within the provisions of the contract relieving him from liability in case of unavoidable accidents, wars, strikes, fires, labor trouble, or other delays. See Farmers Fertilizer Co. v. Lillie, 18 F. 2d 197, 52 A. L. R. 552. See, also, Wickham & B. Coal Co. v. Minnesota Coal Co., 7 F. 2d 873.

The evidence discloses that there was no dispute between the parties as to what the market price was on any given date after the ceiling was eliminated.

Where the defendant had defaulted on its contract to deliver equal monthly installments of merchandise and such requirement had been waived by plaintiff's acquiescence, the defendant had no right to insist that plaintiff's damages for breach should be measured by the market price in the months preceding the final breach of the contract, the market price of such merchandise having

increased after the final breach. See Brevard Tannin Co. v. J. F. Mosser Co., 288 F. 725.

Other assignments of error need not be discussed.

For the reasons herein given, the judgment entered by the trial court on the verdict is sustained.

AFFIRMED.

CHAPPELL, J., dissents.