OLSON CONSTRUCTION COMPANY, APPELLANT, V. COMMER-
CIAL BUILDING & INVESTMENT COMPANY ET AL., APPELLEES.

FILED JULY 17, 1934. No. 28933.

*Sanden, Anderson & Gradwohl,* for appellant.

*Chambers & Holland, C. J. Campbell, Hall, Cline & Williams* and *Max G. Towle, contra.*

Heard before GOSS, C. J., GOOD, EBERLY, DAY and PAINE, JJ., and REDICK, District Judge.

EBERLY, J.

The nature of this case is a suit in equity. The Olson Construction Company sued to foreclose a mechanic's lien for a balance due for construction of a commercial building, and encountered a conventional cross-petition for damages caused by faulty construction filed by the Commercial Building & Investment Company, which will hereinafter be referred to as the building company. The pleadings made up more than 50 pages of the transcript, and the evidence adduced at the trial consists of three large volumes embracing 1,335 pages. To abstract either the pleadings or the evidence would unduly extend this opinion. At the end of the trial occupying several weeks the court found for the plaintiff in the sum of $4,724.96,

balance due by the terms of its contract for the construction of the building, which amount included claimed extras. But the trial court also found for the defendant building company in the sum of $5,920 and directed that such defendant recover the difference between said accounts, or the sum of $1,195.04, with interest at 7 per cent. A motion for a new trial was filed by plaintiff, and from the order overruling the same it appeals. The defendants, including the building company, filed no motion for new trial, and neither have they perfected a cross-appeal.

The sole matters presented for our consideration relate to the correctness of the judgment of the trial court in favor of the defendant building company for the following items: Owner's loss of rent on the first floor of the building in the sum of $250, and on the second and third floors in the sum of $1,100, due to failure to complete the building on or before May 1, 1930, as required by the contract; damages for failure to comply with terms of the contract relating to the painting of the "waiting room, etc.," $370; damages for failure to properly complete construction of the second and third floors, $4,200. But, in many respects, these questions as here presented will have to be determined from disputed evidence, detailed from the witness-stand by witnesses appearing and testifying in person before the trial court. A number of ,witnesses, properly to be designated as expert witnesses, so testified at length. The trial court saw them, heard them, and observed them when testifying. Preponderance of evidence is not necessarily determined by the number of opposing witnesses.

Where the evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have adopted one view of the facts rather than the opposite. *Magill v. Magill,* 114 Neb. 636; *Peterson v. Winkelmann,* 114 Neb. 714; *Enterprise Planing Mill Co. v. Methodist Episcopal Church,* 100 Neb. 29; *Greusel*

*v. Payne*, 107 Neb. 84; *Shafer v. Beatrice State Bank*, 99 Neb. 317; *Jones v. Dooley*, 107 Neb. 162.

The first item of counterclaim permitted by the trial court is referred to in its decree in the following language:

"That the plaintiff when painting and decorating the waiting room, etc., in the said building, did not permit the plastering to dry sufficiently before applying the paint and did not perform the work in a proper and acceptable manner; and in consequence thereof the work did not stand up, but almost immediately became blotched and unsightly and not up to the requirements of the plans and specifications; that by reason of the premises the owner was damaged by the plaintiff in the sum of $370 and that the owner is entitled to recover such sum from the plaintiff upon his cross-petition."

We find the evidence fully sustains this determination and the same is approved.

The next item for consideration is $1,350 in damages, allowed for failure to complete the building within the time as specified by the contract. That the building was not completed within the time specified is conclusively established. The actual damages occasioned thereby are amply proved. However, appellant claims that it was entitled to certain extensions of this time and that the building was completed within such time if credit is allowed for extensions to which it was entitled. Obviously, the contract provisions govern. The form of contract is one issued by the American Institute of Architects, being, "The standard form of agreement between contractor and owner for construction of buildings, * * * when a stipulated sum forms the basis of payment." Among its provisions are the following: (a) "That the contractor and the owner * * * agree as follows * * * and shall do everything required by this agreement, the general conditions of the contract. * * * (b) The work to be performed under this contract shall be * * * completed May 1, 1930."

The following appear in "The general conditions of the contract":

"Art. 1 * * * (f) All time limits stated in the contract documents are of the essence of the contract."

"Art. 15. Changes in the work. The owner, without invalidating the contract, may order extra work or make changes by altering, adding to or deducting from the work, the contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change."

"Art. 18. Delays and extension of time. If the contractor be delayed at any time in the progress of the work by any act or neglect of the owner or the architect, or of any employee of either, or by any other contractor employed by the owner, or by changes ordered in the work, or by strikes, lockouts, fire, unusual delay in transportation, unavoidable casualties or any causes beyond the contractor's control, or by delay authorized by the architect pending arbitration, or by any cause which the architect shall decide to justify the delay, then the time of completion shall be extended for such reasonable time as the architect may decide. No such extension shall be made for delay occurring more than seven days before claim therefor is made in writing to the architect. In the case of a continuing cause of delay, only one claim is necessary."

While a real dispute appears in the evidence as to the extent of the delays occasioned by the owners, and as to whether certain delays were occasioned by causes which would entitle the contractor to an extension of time, there is no dispute that the contractor wholly failed to conform to the provisions of article 18 above quoted, and never made an application for an extension of time as therein required, nor has due waiver thereof been established by competent proof.

In the decision of a similar question the following language was employed by this court in *Carter v. Root*, 84 Neb. 723, 731, viz.: "We come now to the second ques-

tion presented: Is the defendant herein entitled to recover damages for the delay in the completion of said building? There was a delay of 150 days. The contract itself provided for some contingencies which might operate to delay the completion of the building, such as the act, neglect, or default of the owner, or the architect, or of any other contractor, or delays occasioned by fire, lightning, earthquake, or cyclone or abandonment of work by employees. It was stipulated that the time given for the completion of the building might be extended for a period equal to the time lost by reason of any or all of the causes above mentioned, but that no such allowance of time should be made unless a claim therefor in writing was presented by the plaintiff to the architect. Such contracts are legal and enforceable. Courts have generally held that provisions requiring written notices for additional time must be complied with. *Chapman Decorative Co. v. Security Mutual Life Ins. Co.*, 149 Fed. 189; *Curry v. Olmstead*, 26 R. I. 462; *Dermott v. Jones*, 23 How. (U. S.) 220; *Feeney v. Bardsley*, 66 N. J. Law, 239; *Davis v. La Crosse Hospital Ass'n*, 121 Wis. 579; *Consaul v. Sheldon*, 35 Neb. 247. Plaintiff herein failed to give notice that additional time was required. The reason that a notice in writing is required is because the contract provides therefor. * * * In the absence of a written demand for additional time or waiver thereof, the plaintiff cannot be relieved from damages if such delay was caused by any of the agencies, the existence of which entitled him to additional time upon his written notice."

Further, "Where the contract so provides the builder must give notice to the owner or the architect of delays arising from stipulated causes, or of his claim for additional time by reason of such delays, or he will not be excused or entitled to additional time, unless such formality is waived." 9 C. J. 782.

And again: "Where the contract so provides, the determination of whether the builder's delay was occasioned by any of the causes stated in the contract and without

fault on the part of the builder, and if so, what additional time would be just and reasonable, must be made by the architect or engineer." 9 C. J. 782, 783.

It is quite obvious, in principle, in view of the explicit agreements of the parties on the subject of "extra time," that the conclusion announced by the trial court as to damages occasioned by delay in the completion of the building is the conclusion which the evidence considered *de novo* compels. Total failure of the contractor to comply with the terms of the contractual provisions quoted, which constitute a prerequisite to its right to relief, under the facts in the case, excludes its claims without reference to their merits otherwise.

The most important matter of dispute between the parties relates to the subject of the construction of the second and third floors. The trial court determined they were improperly constructed, and allowed $4,200 as damages therefor. The following provisions of the contract of the parties, it is thought, have a bearing on the questions to be determined:

"Art. 17. Deductions for uncorrected work. If the architect and owner deem it inexpedient to correct work injured or done not in accordance with the contract, an equitable deduction from the contract price shall be made therefor."

"Art. 19. Correction of work before final payment. The contractor shall promptly remove from the premises all materials condemned by the architect as failing to conform to the contract, whether incorporated in the work or not, and the contractor shall promptly replace and reexecute his own work in accordance with the contract and without expense to the owner and shall bear the expense of making good all work of other contractors destroyed or damaged by such removal or replacement.

"Art. 20. Correction of work after final payment. Neither the final certificate nor payment nor any provision in the contract documents shall relieve the contractor of responsibility for faulty material or workmanship and,

unless otherwise specified, he shall remedy any defects due thereto and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of substantial completion."

We have before us as our fundamental guide in the settlement of this controversy a contract in writing. The general rule appears to be that where parties have entered into a contract or agreement which has been reduced to writing, in the absence of fraud or mistake, parol evidence is not admissible to contradict, vary, alter, add to or detract from the terms of the instrument. *Norfolk Beet Sugar Co. v. Berger,* 1 Neb. (Unof.) 151; *State v. Board of County Commissioners of Cass County,* 60 Neb. 566; *Sylvester v. Carpenter Paper Co.,* 55 Neb. 621; *Delaney v. Linder,* 22 Neb. 274; *Agnew v. Montgomery,* 72 Neb. 9.

A party who relies upon custom or usage, either to show performance by him or nonperformance by the other party to the contract, must plead the same.

Within the "general conditions" of the controlling contract we find the following provision: "Art. 2. * * * The contract documents are complementary, and what is called for by any one shall be as binding as called for by all. The intention of the documents is to include all labor and materials, equipment and transportation necessary for the proper execution of the work."

In the event of an omission from an instrument which is supplied by implication or presumption of law, parol evidence is not admissible to supply the same. *Driver v. Ford,* 90 Ill. 595; *Union Special Sewing Machine Co. v. Lockwood,* 110 Ill. App. 387; *Warren v. Wheeler,* 8 Met. (Mass.) 97; *Blake Mfg. Co. v. Jaeger,* 81 Mo. App. 239; *Thompson v. Ketcham,* 8 Johns. (N. Y.) 190, 5 Am. Dec. 332.

As to the actual conditions of the upper two floors in controversy, the following facts may be said to be fairly established by the evidence, viz.: When the concrete used on the second floor was being poured, the struts or supports of the steel pans involved were rested upon the

ground underneath, and hot water running from these pans and concrete work above fell upon the ground on which such supports rested, with the resulting effect that this ground and the supports of the pans gave way and the beams above were bent or bowed, and the concrete floor being poured necessarily settled, thus requiring the pouring of more concrete in order to bring it to level, and extra cement was poured in an attempt to bring this floor to proper level. Upon the completion of the work, and after the cement had set and hardened, an instrument survey was made and it was found to be out of level 2 41/64 inches, and also to contain many depressions or pockets in which variations were found of an inch in a square of ten feet. In these particulars this second floor was not constructed in a good and workmanlike manner, though it may be said that an absolutely true and dead level floor was not required in the specifications of the architect. Further, such second floor was to a° greater or less extent permeable to water, and water accumulating from ice and snow falling from the wheels and bodies of automobiles stored on the second floor came through this second floor and fell upon the first floor, and upon the merchandise and people occupying the same. To prevent this it was necessary to immediately remove the water that so fell upon the second floor either by sweeping or by some other means, the drains placed in the concrete surface of the floor being insufficient to take care of such water; though it may also be said that waterproof flooring was not contemplated or provided for in the plans and specifications. Further, the construction of the third floor was similar to that of the second floor, being of integral concrete and designed and provided in the plans and specifications as an integral cement floor. Likewise this third floor was permeable to water, was out of true level, and contained many pockets or depressions in which the water tended to gather and to leak through unless immediately swept to the drains or conducted to the water rack, or otherwise removed from the building. The lack of level of the two

floors in controversy and the existence of pockets and depressions in various parts of the same, in which the deviation was an inch or more, rendered such floors more or less unsightly upon close inspection and therefore less valuable than if they had been constructed on a substantial level. No final certificate of acceptance was ever issued by the architect in charge of the construction.

The terms of the contract in suit contemplate that what is not the result of good workmanship will be replaced by what will conform thereto. The language of the contract quoted, viz., "an equitable deduction from the contract price shall be made therefor," if this right on behalf of the owner is waived, implies that such "equitable deduction" shall equal the actual cost of the strict compliance foregone. Then at a more convenient season the owner may procure to be done that which the contractor should have properly performed in the first instance.

As to the cost of supplying the defects in the second and third floors, the testimony of architect Wilson on cross-examination is enlightening, viz.: "Q. And what was your suggestion then as to correction by surfacing the floor? A. If you were to attempt to get a dead level floor on the present construction you would have to do it by either a fill of an inch and a half or two inches of concrete over the present structure, or add an asphaltic material such as unicrete in a thickness of not less than a quarter to half an inch at the thinnest point, and varying in thickness to bring the floor to a perfect dead level. Q. Now, I believe you suggested an inch in thickness in your thinnest place? A. An inch of cement?—I said an inch and a half or two inches; at this time that might be the average thickness. * * * Q. Mr. Wilson, as an architect, do you have an opinion as to the approximate cost of such surfacing per square foot? A. Yes, sir. Q. You may state what your opinion is. A. About ten cents a square foot for a cement surfacing, and about eighteen or twenty cents for the unicrete. Q. And how many square feet are there on each of these floors? A. About 21,000 square feet. * * *

Q. Then the cheaper, the ten cent per square foot, in your opinion would be the better? A. I think it would be from the standpoint of a wearing purpose. Q. Mr. Wilson, will you explain the process that would be necessary in preparing these floors for such a surfacing, what would have to be done to them in repairing them for such a surface? A. For a cement surfacing? Q. Yes. A. They would have to be roughened and chipped enough in order to secure a proper bond for the topping. Q. And how would that be done, what would be the most feasible and practicable way? A. It would have to be done by the use of an air hammer or a type of hand chiseling in order to get some roughened surface to secure a good bond for the topping. Q. Wouldn't that work be of such a character to necessitate the vacation of the floors for use while it was in process? A. Only that part of the floor that is actually being worked on. Q. It could cause a considerable noise and disturbance and a considerable amount of dust, wouldn't it? A. Some. Q. And while the surface was actually being placed that part would have to be vacated, of course? A. Yes, sir. Q. In your opinion what time would it take to surface these floors in that manner? A. Oh, it would take two or three days to each floor, I would think. * * * Q. How long after such surfacing of these floors would it be before they would be ready for use again? A. By using a quick setting cement they could be used in 24 hours. * * * Q. Mr. Wilson, what effect would this additional weight have upon the live carrying capacity of the floors? A. It would reduce the live carrying capacity. Q. Can you estimate what percentage it would be reduced? A. No, sir; I couldn't estimate that. It would be a small percentage."

Accordingly, this court determines that the defendant building company is entitled to an equitable deduction from the contract price in the sum of $4,200 because of the failure of plaintiff to conform to the terms thereof in the construction of the two floors in controversy.

It follows that the judgment of the trial court as heretofore made and entered, being in all respects correct, is

AFFIRMED.