PARSONS CONSTRUCTION COMPANY, A CORPORATION, APPELLANT, V. METROPOLITAN UTILITIES DISTRICT OF OMAHA, A MUNICIPAL CORPORATION, APPELLEE.

104 N. W. 2d 272

Filed July 8, 1960. No. 34756.

King & Haggart and Mason, Knudsen, Dickeson & Berkheimer, for appellant.

George C. Pardee, G. H. Seig, and Harry H. Foulks, Jr., for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought in the district court for Douglas County by Parsons Construction Company, a corporation, as plaintiff, against the Metropolitan Utilities District of Omaha, a municipal corporation, defendant, to recover an amount withheld by the defendant under a contract entered into between the plaintiff and defendant which provided for a stipulated sum as liquidated damages for delayed completion of the construction of an extension to an existing filter building at the district's waterworks in Omaha. In addition, plaintiff sued for damages against the defendant claiming the defendant delayed completion of the contract by various acts and conduct on the part of the district's officers, agents, engineers, and employees acting in an arbitrary and unreasonable manner in violation of the said contract.

At the close of all of the evidence the plaintiff moved that the trial court determine that the damages provided for in the contract between the parties be declared a penalty, and that such provisions be declared void and unenforceable. The defendant moved that the trial court determine that such damages as set forth in the contract between the parties were liquidated damages and not a penalty. The trial court overruled the plaintiff's motion and sustained the defendant's motion.

The plaintiff moved the trial court to determine that defendant was in default in the performance of the contract as a matter of law, and that for this reason the defendant was prevented from enforcing the provisions for stipulated damages contained in the contract. The trial court overruled this motion.

The defendant moved the trial court to determine, as a

matter of law, that the evidence was insufficient to justify a verdict for the plaintiff on the allegations of its petition or to sustain a judgment if such verdict were rendered, and that the petition be dismissed. The trial court sustained this motion and dismissed the plaintiff's petition.

The plaintiff filed a motion for new trial. The trial court overruled the plaintiff's motion for new trial. The plaintiff perfected appeal to this court.

For convenience we will refer to the parties as designated in the district court or, as occasion requires, to Parsons Construction Company as Parsons; to the Metropolitan Utilities District as district or utilities district; to Earl G. Hawkins, Sr., president of Parsons Construction Company, as Hawkins, Sr.; to Earl G. Hawkins, Jr., superintendent of Parsons Construction Company, as Hawkins, Jr.; to the resident engineers under the contract between the Metropolitan Utilities District, a municipal corporation, and Burns & McDonnell Engineering Company, by their last names or as resident engineer or engineers; to the principal engineer for Burns & McDonnell Engineering Company as Davis; to the general superintendent of the water operations for the Metropolitan Utilities District as Detweiler; and to all other witnesses by their last names or titles.

The record shows that the consumption of water in Omaha was such that the water system was unable to meet the demands, due to the growth of the city. This required expansion of production of water, that is, more processing and pumping capacity was needed. The district entered into a contract with Burns & McDonnell Engineering Company of Kansas City, Missouri, hereafter referred to as the engineering company, on May 27, 1954, to do resident engineering and inspection required in connection with the extension at its Florence waterworks. This contract provided in part that the engineering company make recommendations to the district, in writing, with respect to the need for resi-

dent engineering and inspection service to be furnished by them, subject to approval by the general manager of the district. The contract further provided that resident engineers furnished under the contract by the engineering company should at all times be and remain the employees of the engineering company, and under no circumstances be considered employees of the district.

The district gave notice that it would receive bids for the extension of its waterworks and open the same on September 10, 1954. This contract was designated contract No. C-114. The contract provided that the contractor was to begin work within 15 calendar days, to complete all work necessary to enable the commencement of installation under contract No. E-110 within 173 calendar days, and to complete the entire contract within 265 calendar days from and after the date of due notification by the district of its approval and execution of the contract. The amount to be paid Parsons for the project was $471,712.

Article FC-31 of contract No. C-114, provided: "LIQUIDATED DAMAGES: It is mutually understood and agreed by and between the parties to this contract, in the execution of the same, that time is of the essence of the contract. In the event the Contractor shall fail to complete any portion of the work to be performed under this contract by and at the completion time bid in the Proposal, the Contractor shall pay unto the Utilities District as and for the liquidated damages, and not as a penalty, the sum of one hundred fifty dollars ($150.00) for each and every calendar day that the Contractor shall be in default; extensions of time granted by the Utilities District in accordance with the provisions of Article FC-19 shall not operate to the contrary, unless such extensions granted by the Utilities District specifically provide for the waiving of liquidated damages during and over such period of time extension.

"Liquidated damages will be waived for and during the extent of any delay which cannot be overcome by

reasonable acceleration of the approved work schedule, when such delay is caused by factors beyond the Contractor's control, provided that adequate evidence is presented by the Contractor to prove such delay and to enable the Utilities District to determine with exactness the extent and duration of such delay for each item of material and equipment involved.

"The Utilities District shall have the right to deduct said liquidated damages from any moneys in its hands, otherwise due, or to become due, to said Contractor, or to sue for and recover compensation for damages for non-performance of this Contract at the time stipulated herein and provided for."

There are certain established rules of law governing contracts such as contract No. C-114 in the instant case.

In the case of Stanford Motor Co. v. Westman, 151 Neb. 850, 39 N. W. 2d 841, this court held: "As a general rule, the question of whether a sum mentioned in a contract is to be considered as liquidated damages or as a penalty is a question of law, dependent on the construction of the contract by the court." The court cited 15 Am. Jur., Damages, § 246, p. 678, as follows: "In such cases the court must find out whether the payment stipulated is in truth liquidated damages or a penalty. The question whether it is the one or the other is a question of law and one quite independent of the agreement of the parties to call it the one or the other." The court further said: "We said in Gustin & Co. v. Nebraska Building & Investment Co., 110 Neb. 241, 193 N. W. 269: '* * * where the damages are uncertain, and not readily capable of exact ascertainment by any known rule, and the parties surveyed the whole situation at the time of contract, and agreed upon the amount of damages, in case of a breach in the contract to construct a building by a certain time, such sum, in case of a breach, is the true measure of recovery and is liquidated damages and not a penalty.'" The court further held: "If the damages arising from a breach of

the contract are difficult of ascertainment or admeasurement, and if the stipulated amount is not disproportionate to the amount of damages that may be reasonably anticipated from the breach, it will usually be regarded as a provision for liquidated damages." See, also, Sofio v. Glissmann, 156 Neb. 610, 57 N. W. 2d 176; Edgar v. Anthes, 109 Neb. 546, 191 N. W. 682.

As stated in George W. Condon Co. v. Loup River Public Power Dist., 135 Neb. 284, 281 N. W. 31: "It is obvious that plaintiffs' rights in the premises are necessarily measured by the terms of their contract, if its provisions were drawn with the instant situation in contemplation of the parties thereto. * * * These rules are express agreements of the parties, mirror their intentions in entering into this contract, and must be enforced."

As stated in Barkalow Bros. Co. v. English, 159 Neb. 407, 67 N. W. 2d 336: "It has long been the law of this state that if persons to a transaction have put their engagement in writing in such terms as import a legal obligation without uncertainty of the object or extent of the engagement, it is conclusively presumed that the entire engagement of the parties and the extent and manner of their undertaking have been reduced to writing, and any parol agreement is merged in the written contract and testimony of prior or contemporaneous conversations is incompetent. In Securities Acceptance Corp. v. Blake, 157 Neb. 848, 62 N. W. 2d 132, it is said: 'In the absence of fraud, mistake, or ambiguity a written agreement is not only the best evidence but the only competent evidence as to what was the contract of the parties.'"

The plaintiff contends that the trial court erred in holding that the contract provision was for stipulated damages and not for a penalty; that the trial court erred in holding as a matter of law that the defendant was not in default in its performance of the contract, and was not prevented from enforcing the provision for stipulated damages; that the trial court erred in

holding that the evidence was insufficient to justify a verdict for the plaintiff on the allegations contained in its petition or to sustain a judgment for plaintiff if such a verdict were rendered, and in sustaining defendant's motion to dismiss the plaintiff's petition; that the trial court erred in refusing to admit competent evidence offered by the plaintiff at the trial; and that the decision of the trial court is contrary to the evidence and to law.

This record is voluminous and contains a great number of exhibits. We set forth a summary of the relevant and material evidence sufficient to determine whether or not the trial court committed error, as contended for by the plaintiff.

Davis testified that he was a civil engineer or project engineer in the employment of the engineering company. As a project engineer he organized projects for design, and had general supervision of the construction on the project for which he was responsible. He further testified that water projects were his specialty; that he became connected with the project of the district for the expansion of its filter plant and other parts of the district's water system in Omaha; that the district needed modern improvement to expand the low service and high service pumping capacity; and that there was need for a completely new chemical process, new sedimentation basins, and expansion of the filter system. He further testified that he supervised the preparation of the drawings and contract documents relating to contract No. C-114; that the legal sections therein, FC sections, were a product of years of development and growth in the engineering company; and that the company used a standard form of contract and modified it for the particular project. Davis further testified that the expansion of the filter plant was badly needed; that the demands for water in Omaha were going up every summer and the plant was overloaded; and that the engineering company could anticipate that during the next sum-

mer there would not be enough water filtered to supply the demand. The engineering company determined that the time specified for the contractor to complete the project was adequate. Davis further testified that when the engineering company did work for clients such as the district, it tried to determine with some reasonable precision what the damages or loss might be because of delay, because of the interest that would have to be paid on bonds, as such projects are ordinarily constructed with borrowed money, the price that it might be required to pay the resident engineer, or engineers, on the project and to make a reasonable estimate of overhead that the client might be required to pay. In addition, Davis testified that the plant expansion and improvements and the efficiency of the same should be taken into consideration, and what the project is to be used for; that it would be extremely difficult to place a dollar value on the loss of efficiency of the plant; that with an ineffective filter plant, the filters would have to be overloaded which would require a high grade of pretreatments and additional chemicals; that because of the manner in which filters are constructed hydraulically, only a certain amount of water goes through each filter bed, and when all the filters in service are operated at maximum capacity, there is no more; and that to operate the filters near peak capacity it is necessary to have a first-class job of pretreatment. In other words, the poorer the pretreatment the shorter runs there will be on the filter beds and the oftener they have to be taken out of service to backwash. There is expense involved each time a filter is backwashed. Davis further testified that the engineering company takes into account the expense that might result to the client through delay, and tempers the amount according to the size of the job or contract; that there are many factors that could enter into the determination of what liquidated damages might be; and that in this instance the filter building was needed early in June because of big de-

mands for water during the summer.

Hawkins, Sr., part owner of Parsons, examined the site and prepared the cost estimate that went into the bid. He testified that in 1937, Parsons built an addition to the same filter plant, and he knew what the difficulties were. He also was familiar with contracts such as contract No. C-114, and the manner in which the same were handled by the district. Parsons had a similar contract with the district for the construction of mixing basins in 1945, and for delay of completion of the work under that contract was required to pay liquidated damages. Hawkins, Jr., was in charge of this project. Otte was Parsons' superintendent on the job, working under the general supervision of Hawkins, Jr., from September 30, 1954, until April 20, 1955. Obert succeeded Otte as superintendent on the job until the contract was completed. He, like Otte, was in charge of the laborers and workmen for Parsons in the performance of this contract, and reported to Hawkins, Jr., who visited the job at least once a day while it was in progress.

Resident engineer Lindemood, whose job it was to see that the contract was carried out according to the plans and specifications, testified that when the addition to the filter plant was not available for use in June 1955 and it became obvious from the daily peaks of water consumption required through May and June that the existing filter beds would not be able to filter the quantity of water required, the district installed by-pass lines. In order to more adequately treat the water which would not be able to pass through the filter beds, it became imperative that some system be developed for treating additional unfiltered water. As a consequence, the by-pass lines were installed for that purpose. The filter beds had a capacity, under normal operation, of passing 72 million gallons of water per day, in every filter bed. Then there was a safety design that made it possible to safely put 90 million gallons of water a day through under an overload condition.

With reference to using the by-pass lines which delivered nonfiltered water to the people of the community, the general superintendent of the water operations for the district testified that all water that went through the by-pass lines was settled water, and it was necessary to apply heavy chlorination to that volume of water that was passed from one basin to the other, so that the district would maintain a potable water. This witness also testified that there were some 35 or 40 days when the volume of water delivered for consumption exceeded the 90 million gallons a day rate during the summer of 1955; that the peak demand was 120 million gallons a day; and that everything over 90 million gallons a day was unfiltered water that went into the community. This witness further testified that this is not a good practice in the waterworks industry, for the reason that: "You are taking a chance on the quality of the water and you are getting retrogression in your treatment process." This witness also testified that the unfiltered water which was delivered through the by-pass lines was treated with chlorine, and every effort was made to keep the water in suitable condition, but there was a chance taken when that was done; and that the usage of unfiltered water treated only with chlorine might have an adverse effect and the sanitary quality might be affected also. With reference to the water that was not filtered, this witness testified: "It was a necessary operation due to the lack of capacity of the filter plant, and on the other hand we were taking some chance in processing the water in that manner, in handling the water in that manner." On cross-examination this witness testified that the district would not intentionally deliver contaminated water to the city; and: "We were still taking a chance on this method of operation in case our judgment was not right."

In this connection, the cost of the by-pass lines and the operation of the same during the summer of 1955; together with the treatment necessary to be used to

make the water potable, would constitute damages accruing to the district.

As heretofore stated, the filter plant was inefficient and could not furnish an adequate water supply. The inefficiency of such plant could not be evaluated on a dollar basis.

Thus, the evidence discloses many elements of damages suffered by the district which are uncertain in nature and amount and difficult of ascertainment, and which are not unreasonably disproportionate to the amount of damages which might have been anticipated as provided for in the contract. This is a case where a provision in the contract for liquidated damages is applicable.

The contractor under the contract in question was familiar with this type of construction and had done more of it than any other contractor in Omaha.

We deem the following to be applicable.

In Wilson & Co., Inc. v. Fremont Cake & Meal Co., 153 Neb. 160, 43 N. W. 2d 657, this court said: " 'Inconvenience or the cost of compliance, though they might make compliance a hardship, cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful. Parties sui juris bind themselves by their lawful contracts, and courts cannot alter them because they work a hardship. The rights of the parties must be measured by the contract which they themselves made. * * *' 12 Am. Jur., Contracts, § 362, p. 928. * * * 'If a party by his own contract creates a duty or imposes a charge on himself, he must under any and all conditions substantially comply with the undertaking.' 12 Am. Jur., Contracts, § 363, p. 930. See, also, Columbus Ry. P. & L. Co. v. Columbus, 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 699, 6 A. L. R. 1648; Cameron-Hawn Realty Co. v. Albany, 207 N. Y. 377, 101 N. E. 162, 49 L. R. A. N. S. 922."

In the light of the foregoing, the trial court properly held, as a matter of law, that the damages stipulated

in contract No. C-114 were not a penalty, but provided for liquidated damages.

The plaintiff contends that in the event this court finds that the provision for stipulated damages in contract No. C-114 is valid, then the district is precluded from enforcing this provision of the contract for the reason that the district was in default in its own performance of the contract, and by its acts and omissions delayed Parsons' performance of the contract.

Article FC-19 of contract No. C-114 provides in part as follows: "The Contractor expressly covenants and agrees that in undertaking to complete the work within the time herein fixed, he has taken into consideration and made allowances for all of the ordinary delays and hindrances incident to such work whether growing out of delays in securing materials or workmen, or otherwise. Should the Contractor, however, be delayed in the prosecution and completion of the work by any cause beyond his control, including delayed shipment orders, or by any changes, additions, or omissions therein ordered in writing by the Utilities District, or by the abandonment of the work by the men engaged thereon through no fault of the Contractor; * * * or by neglect, delay or default of any other contractor of the Utilities District, * * * the Contractor shall have no claims for damages for any such cause or delay; but he shall in such cases be granted such extension of the time specified for the completion of the work as the Utilities District shall award in writing on account of such delays, provided, however, that claim for such extension of time is made by the Contractor to the Utilities District in writing within one week from the time when any such alleged cause for delay shall occur.

"The Board of Directors of Metropolitan Utilities District at its sole discretion may waive the above requirements and grant extensions of time for any other reason or reasons it deems valid."

The contractor, Parsons, made five requests in writ-

ing for extensions of time within 1 week from the time an alleged cause for delay occurred, as provided for by article FC-19 of contract No. C-114. One such request for an extension of time was due to the carpenters' strike and was allowed for a period of 15 days. The carpenters' strike began on June 1, 1955, and no work was done by the contractor due to such strike until June 16, 1955, when the strike was settled and the carpenters went back to work.

By letter dated January 10, 1955, Parsons requested an extension of time in the amount of 21 days, due to the relocation of a 42-inch drain line, claiming that it had to cease operation on this work for 21 days. With reference to this request, it was necessary that a change be made to avoid an obstacle that was not known to the parties. The contractor received payment therefor. Hawkins, Sr., testified that he did not believe the obstacle could be determined before it was exposed by excavation. It appears that this item did not prevent the contractor from working. It did cause a halt insofar as that particular item was concerned and a shift in the schedule of operations. If there was any delay by virtue of this item, it appeared to have been of little consequence, insofar as the work on the contract was concerned, because Hawkins, Sr., by a letter, said that the contractor expected to have the building ready for occupation by June 1, 1955, barring labor strikes and with the cooperation of the superintendent of water operations.

The plaintiff claimed a delay beyond its control on account of the bad weather that prohibited doing any work on the project during the winter and spring of 1954 and 1955. A 5-day and a 3-day delay were requested.

The resident engineer's reports disclosed the temperatures at 8 a.m. and 5 p.m. for each day for which Parsons claims an extension of time due to weather conditions, and in addition the amount of work done

on each of said days by Parsons. These reports disclose that the weather was not of such a nature that Parsons could not proceed with its work.

Hawkins, Sr., testified that it is customarily known that in the event of bad weather, overtime might be required to make up the loss in order to complete the project on time, except if the contractor is confronted with such bad weather that it would be necessary to ask for an extension of time. Parsons took the weather in this area into consideration when it bid on the contract. This witness stated that Parsons anticipated it was entirely possible that some additional shift and overtime work would have to be done in the completion of the contract. This extension of time due to weather was denied by the district on the ground that the weather was not unusual in this area, and it was one of the ordinary delays covered by the first sentence of article FC-19 of contract No. C-114 as set forth above.

The plaintiff made a request for an extension of time due to the teamsters' strike which occurred on July 21, 1955, and was in the nature of a secondary boycott. The teamsters' primary dispute was with the Ready Mixed Concrete Company which supplied all of the concrete used by plaintiff in the construction of the filter building extension. Pickets were placed on the project in an endeavor to induce the plaintiff to cease doing business with the Ready Mixed Concrete Company, and such strike was against all the contractors in Omaha who used ready mixed concrete in their work. The plaintiff's employees refused to cross the picket lines. This stoppage of work continued for 21 days. This request was denied by the district because the contractor was in default of its contract when the teamsters' strike started. The plaintiff is not entitled to strike-delay credit after the final completion date of the contract.

No other claim for extension of time was made by the contractor within 1 week from the time when any other

cause for delay occurred during the progress of the work under contract No. C-114.

In Olson Constr. Co. v. Commercial Building & Investment Co., 127 Neb. 609, 256 N. W. 22, quoting with approval from Carter v. Root, 84 Neb. 723, 121 N. W. 952, this court said: " 'Courts have generally held that provisions requiring written notices for additional time must be complied with. * * * Plaintiff herein failed to give notice that additional time was required. The reason that a notice in writing is required is because the contract provides therefor.' "

In the instant case the contractor was aware that requests for time extensions must be in accordance with the contract. This is manifest by the fact that Parsons submitted, within 1 week from the time when an alleged delay occurred as required by article FC-19 of contract No. C-114, five separate requests for extensions of time in asking for a delay. Any and all other extensions of time requested by the contractor were not within 1 week as required by said article, but were by a letter written by Parsons on April 27, 1956. The requests for time thereunder were denied.

There appear to have been six change orders which are a part of contract No. C-114. These changes increased the contract price by $6,484.37, for which the plaintiff was paid. No request for extension of time on account of these changes covered by the six change orders was made until the letter of April 27, 1956, written by Hawkins, Sr., to the district. No claim for extension of time was made by the contractor to the district in writing within 1 week from the time when such changes were ordered or made. The amount of increase by $6,484.37 in a contract of the size here considered would not be an unusual occurrence. Practically every construction job of this magnitude would have delays which cause additional cost to the contractor.

The plaintiff states that in the event this court concludes that the provision for stipulated damages pro-

vided for in the contract is valid as one for liquidated damages, the district is precluded from enforcing it, for the reason that the district was in default in its own performance by its own acts and omissions, and delayed the plaintiff's performance of the contract. In accordance with this, the plaintiff makes reference to certain stop orders by which the plaintiff claims that on at least four occasions it was delayed in its work for causes over which it had no control.

We have heretofore set forth the claim made relating to the 42-inch drain pipe which need not be repeated.

The plaintiff states that the contract called for the facing of the outside walls of the filter building extension with brick which was intended to match as closely as possible the face brick in the existing filter building. The plaintiff submitted samples of brick, and selection was made by the district as being in accordance with the specifications. Brick of the same kind was ordered by the plaintiff and was shipped to the jobsite beginning in December 1954. On March 14, 1955, after some brick had been laid, the plaintiff was ordered to stop all bricklaying work while the district made a further investigation to determine if more suitable brick might be obtained. The plaintiff submitted additional samples. Thereafter the district concluded that the work should continue, using the same brick that had been originally selected, and so directed Parsons on March 29, 1955. The plaintiff claims that during the interim when all the bricklaying work on the project was stopped, the plaintiff's bricklaying crew dispersed and went to other employment; that when the order to resume the work of bricklaying was issued, the plaintiff was unable to obtain a crew of bricklayers to do this work, due to the shortage of bricklayers in Omaha; and that at the time the stop order was issued, the plaintiff had scheduled its work in such a way that the bricklaying crew then working would be continuously employed on the project until all the brickwork was completed. Because

of this stop order, the plaintiff claims it was delayed for a period of 20 days in the performance of its contract.

Article FC-26 of the contract provided in part that: "The Utilities District may at any time suspend the work, or any part thereof, * * *."

Article FC-12 of the contract provided that the engineers were authorized to condemn and reject any defective work or material and so suspend the work when the same was not being properly done.

The record discloses that the contractor was requested to cull out and discard the worst bricks. This occurred in March 1955, and there was no written request made for an extension of time by the plaintiff until April 27, 1956. In other words, the plaintiff failed to comply with the provisions of contract No. C-114.

The plaintiff states that the contract called for the revamping of the heating system in the existing filter building; and that on February 10, 1955, when the plaintiff's subcontractor was ready to commence performance of this work, the district directed that this work be stopped pending further investigation. The district decided that the work should proceed in accordance with the orginal plans and specifications and so directed the plaintiff on March 9, 1955. The plaintiff claims that because of this stop order it was delayed 30 days in the performance of this contract.

Article FC-26 of contract No. C-114 provided that the district had a right to make such a request. Hawkins, Sr., testified that such a request did not keep Parsons from working on the construction of the filter plant extension.

The plaintiff states that the contract called for the construction of a roadway and parking area by the plaintiff; that on November 20, 1954, the plaintiff scheduled a crew and equipment to commence performance in such respect, and was ordered to stop work on this phase of the project; and that the plaintiff had scheduled the work in such a way that the sub-base could be com-

pleted before the area became cluttered with materials. The stop order was rescinded on May 16, 1955. The plaintiff claims that as a result of such stop order it was delayed 21 days in the performance of its contract.

Regarding the roadwork, it was pointed out to the contractor that through November and December was not the best time to get a base for roadwork; and that freezing and thawing conditions that could exist might not be inducive to good construction practice as it relates to roadways and walkways. No request was made with reference to this matter until April 27, 1956. There was some work to be done by the contractor under the contract which entailed a duct line that had to be run through the area where the roadway was supposed to go, and it would have been a mistake to put the roadway in at that time, and subsequently have to tear it up.

The plaintiff states that the specifications provided that the earth under certain parts of the foundation of the filter building extension should be compacted to a density of 95 percent. The plaintiff commenced the work of compacting this soil on October 24, 1954, and continued under the supervision of the district's engineers to attempt to obtain the required compaction in certain areas until the end of November 1954, and found it impossible to obtain such compaction. The engineers waived the requirements and accepted compaction of a lesser density.

Article B-14 of the contract provides in part: "Each bidder shall visit the site of the work and thoroughly and fully inform himself relative to construction hazards and procedure, labor, and all other conditions and factors, local and otherwise, which would affect the prosecution and completion of the work and the cost thereof, * * *. It must be understood and agreed that all such factors have been properly investigated and considered in the preparation of every proposal submitted, as there will be no subsequent financial adjustment, * * * which

is based on the lack of such prior information or its effect on the cost of the work."

Hawkins, Sr., testified that he examined the site before preparing the bid. A soil test could have been made, but it was apparent the contractor preferred to rely on his previous experience and examination of the site.

The plaintiff states that the district failed to require the Bacharach Company to perform its work under contract No. E-110 with due diligence. Engineer Davis fully explained this, and it appears from the evidence that in no event could the contractor under contract No. E-110 proceed to do any substantial amount of work as required by its contract, due to the promises made by Parsons to have certain parts of the structure in proper condition to do such work. This contractor kept in touch with the engineering company, provided a standby superintendent to notify it when it could commence the work, and endeavored to do certain parts of the work at various times to facilitate its contract. Davis testified that the contractor under contract No. E-110 at no time delayed work by Parsons, on the other hand, Parsons did hold up and delay work under contract No. E-110.

The plaintiff contends that the defendant violated article FC-25 of the contract which relates to payments, and in addition makes claim for interest on the amount withheld from the balance due on the contract price, which plaintiff contends was wrongfully withheld. The plaintiff also makes reference to article FC-34 of the contract. In consideration of the said articles of the contract, the plaintiff asserts that the defendant's evidence shows that the contract was substantially and satisfactorily completed not later than April. 14, 1956.

There appears to have been a meeting on January 15, 1957, held with the board of directors of the district and at which the plaintiff's counsel was present. Following this meeting the district paid Parsons $10,563.04, as ap-

proved by the board of directors of the district, to be applied on any balance due on the contract, and informed Parsons that the district was retaining the sum of $40,200 as liquidated damages in accordance with the contract provisions. There is no evidence that payments were not made within the time agreed upon after the estimates had been approved by the board of directors of the district, and no violation of the contract as contended for by the plaintiff relating to payments. With reference to the interest claimed by the plaintiff, the trial court's ruling thereon in dismissing the plaintiff's claim therefor was not erroneous.

The plaintiff states that on July 16, 1955, employees of the district accidently flooded an excavation which had been prepared by plaintiff for the reception of a 54-inch water line. On July 21, 1955, after the plaintiff had commenced repairing damages from the first instance, defendant's employees once again flooded the excavation, causing several cave-ins along the side of the trench. In order to repair this damage, it was necessary for plaintiff to clean out the muck from the trench, to recompact the soil, and to re-set several sections of the pipeline which had been placed in the trench prior to the flooding. Plaintiff claimed it was delayed 14 days in the performance of its contract, and incurred $1,441.31 in additional costs by the necessity of repairing this damage. This additional cost was paid by the defendant.

It appears that the plaintiff executed a release in the usual form for this claim. This was a compromise settlement which covered all loss or damage sustained by this claim. The defendant pleaded this settlement in its answer and the same was admitted in the plaintiff's reply. We believe the trial court properly excluded the evidence relating to the above item because the plaintiff failed to file a claim for extension of time as provided for by the contract.

There is much evidence with respect to the progress

of the work under contract No. C-114, which is mostly contained in letters written by the parties to the action.

It appears from the record that a conference was held in the office of the district on December 20, 1954, attended by the Messrs. Hawkins, the district's attorney, and the engineers. In that conference Hawkins, Sr., agreed to have the building ready for operation by June 1, 1955, and this was confirmed by a letter on January 27, 1955. This was after the engineers wrote a letter to Parsons on January 19, 1955, calling attention to contract No. C-114 and the lack of progress on the part of Parsons in progressing the construction work.

On February 9, 1955, the plaintiff submitted a progress schedule which had a completion date of June 30, 1955. Hawkins, Sr., said that the revised progress schedule submitted was to appease the district and its engineers so that it would start to release Parsons' money.

The record shows that on March 4, March 10, and March 18, 1955, the resident engineer wrote Parsons to the effect that certain items in the contractor's schedule had not been completed and were past the completion dates, and requested Parsons to work on weekends to facilitate the completion of the project.

On April 4, 1955, the plaintiff started a second shift consisting primarily of carpenters and labor helpers erecting form work. This second shift was maintained until May 16, 1955.

On April 28, 1955, the resident engineer wrote a letter to the plaintiff reminding it that a considerable amount of work would be required on the project to be ready for the installation of equipment under contract No. E-110, and other items that needed attention, and also recommended that plaintiff work a full double shift 7 days a week until the building was ready for the equipment installation and the sealing weir completed.

When the contractor discontinued the second shift, a conference was called on May 18, 1955. This conference was attended by Mr. Detweiler, the district's engineer,

Messrs. Hershey and Dons of the Bacharach Company which had the equipment contract, and the Messrs. Hawkins. The resident engineer testified that the occasion was that as a result of the delay in progress a double shift had been set up and during the work earlier in May this shift had been discontinued, and an endeavor was made to establish what had caused the discontinuance of the double shift. At that time the job was not sufficiently completed so the representatives of the equipment contractor were present to ascertain what kind of a schedule could be made so they could proceed with their work and be able to continue their work to the completion of contract No. E-110. At this meeting the resident engineer asked Hawkins, Sr., when he could get the job done. Hawkins, Sr., stated that Parsons could get the job done in the early part of July 1955; that he anticipated finishing the job to where the district could put the extension to the filter building to use in the summer of 1955; and he definitely promised to have the building ready.

On January 26, 1956, Hawkins, Sr., sent a letter to the resident engineer. In this letter the writer was referring to two or three matters, and stated that everyone had operated in good faith and had been realistic in trying to avoid difficulties. Further the letter stated that the writer would like to see these two jobs settled on the basis of no penalties against anyone; no penalties against contract No. C-114 on the filter building, no penalties in the way of additional costs by Parsons on the basins against the district, no additional costs by Parsons for setting Walker equipment, and no penalties by reason of extending additional equipment costs by the district against Walker.

On March 1, 1956, Hawkins, Sr., sent a letter to the general manager of the district in which he said: "On the Filter Plant our time completion is subject to criticism and I know was not satisfactory to the District or your Engineers. Neither was it satisfactory to us, al-

though we made every reasonable attempt to make it so. I do not believe there are any questions on the work itself or the class of workmanship or additional contract work. I have indicated by letter to your Engineers the manner in which we feel the finals on these two jobs should be closed out. I also feel they are fair, equitable, and to the best interests of the District to be considered in the manner described. I also feel they can be done so without any conflicts with our contracts."

The contractor's letter of March 1, 1956, was acknowledged by the general manager of the district on March 9, 1956, who suggested that the contractor explain the reason for the delays and why the contractor felt the extensions of time should be granted.

On April 27, 1956, the contractor sent a letter to the general manager of the district which contained the following: "If you will review the delays and difficulties occurring during the construction of the Filter Plant addition and the Basins you will find that they were unavoidable and not due to neglect on the part of any one particular party. We are requesting that in lieu of trying to determine proper time extensions that you not assess any liquidated damages and that these two jobs be settled on the basis of my letter to you of March 1, 1956 and my letter to the Engineers of January 26, 1956."

In the case of George W. Condon Co. v. Loup River Public Power Dist., *supra*, referring to a construction contract without a "no damage" clause, this court said: "* * * it is expressly provided that no claim such as here presented shall be valid unless the contractor gives the engineer written notice thereof before the performance of the work, and no such notice in writing was even given. In fact, none of these provisions was complied with by plaintiffs, and the terms of the contract upon which they sue, under these circumstances, forbid recovery by them." See, also, Psaty & Fuhrman,

Inc. v. Housing Authority, 76 R. I. 87, 68 A. 2d 32, 10 A. L. R. 2d 789.

In A. Kaplen & Son, Ltd. v. Housing Authority, 42 N. J. Super. 230, 126 A. 2d 13, it is said: "Stipulations like the questioned proviso are obviously conceived in the public interest in protecting public agencies contracting for large improvements on the basis of fixed appropriations or loan commitments against vexatious litigation based on claims, real or fancied, that the agency has been responsible for unreasonable delays." Numerous cases are cited to the same effect.

None of the foregoing items involved any wrongdoing on the part of the engineers or the district. There is no breach of contract which would entitle the plaintiff to damages from the defendant. If the contractor was delayed and was damaged thereby, the remedies are spelled out in the contract.

While we have set forth evidence pertaining to the alleged delays caused plaintiff by the flooding of the weir chambers and pipe trenches, evidence concerning soil compaction, and evidence relating to alleged damages caused by the acts and omissions of the defendant and those for whom the defendant was responsible, the trial court refused to admit some evidence relating to the foregoing and, in addition, refused to admit evidence relating to the water system improvements report and the supplemental report on water system improvements. Most of this evidence has been covered in this opinion. However, a careful examination of the record discloses that the trial court did not err in the admission or rejection of certain evidence as contended for by the plaintiff.

There are items such as a delay in obtaining the proper crane rail, the delivery of materials, and other minor items which Parsons claims delayed the progress of its work and for which the district was responsible. It appears that either such items were not pleaded by the plaintiff in its petition, that Parsons failed to comply

with the proper procedure relating to such matters, or that Parsons failed to give proper notice as required by contract No. C-114.

In every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any evidence upon which the jury can find a verdict for the party producing it, and upon whom the burden of proof is imposed. See, Christ v. Nelson, 167 Neb. 799, 95 N. W. 2d 128; Johnsen v. Taylor, 169 Neb. 280, 99 N. W. 2d 254.

In accordance with the above rule, the trial court properly dismissed the plaintiff's petition.

For the reasons given herein, the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.